Calling now case number two, appeal number 23-3200, Yash Venture Holdings versus Moca Financial. All right. You'll have to help me. I'm going to call Mr. Zamuda. Am I pronouncing that correctly? Yes, you are. All right. Thank you. Good morning. May it please the court, counsel? This case is about more than $600,000 of software development work in exchange for a 15% equity interest in Moca Financial. The primary question for this court is whether the asserted claims to obtain such 15% interest were wrongly dismissed. The standard of review, as the court is aware, under 12b-6 is de novo. A claim should not be dismissed if it is spatially plausible, meaning it is supported by factual content, allowing the court to reasonably infer the defendant is liable for the alleged wrong. Dismissal must be rejected even if proof of facts is improbable and recovery is very remote and unlikely. We have asserted a number of claims here, but underlying all of those claims is the question, what did the Moca defendants do? They made a deal, then they attempted to change that deal, which is the ruse, as we say. Then they said, we have no deal, which completed their scheme. Yash Venture performed pursuant to the agreement it had. If it had not performed, clearly the Moca defendants would be here rightfully arguing Yash Venture gave nothing for a 15% interest. So I take it then, I just want to make sure that I'm reading the record correctly, that the defendants accepted the services that were provided by Yash Venture Holdings. Is that correct? That is correct, Your Honor. No question of fact whatsoever about that. And how does your client value those services? You say it's more than $600,000. What does that mean? Basically, this was a project by which resources were used to create this software. Some overseas, I believe, some in this country, but people actually configuring the software. And that became the platform for the whole business model for Moca. So the $600,000, the salaries and the costs that your client incurred in providing the services, I'm just trying to understand what the $600,000 is. That's correct, the cost of those resources to develop that software. Okay. Thank you. For pleading purposes, with respect to the breach of contract claim that we've asserted, Yash Venture alleged all that was required being an offer and acceptance and consideration. The district court and the defendants point to documents unilaterally prepared by the defendants after November 18, 2018, when the oral agreement was reached. To support the assertion, the parties had no agreement at all. However, that contention is wrong, as the oral promise and acceptance were not conditioned on the papering of the deal. The November 18, 2018, communication during which the contract terms were agreed also is the basis for other factual claims, some in the alternative that were asserted in the Third Amendment complaint. Can we back up to where you began? Yes. So we need offer, acceptance, and then offer, you know, the parties have to agree on a material term. Yes. So I take it your position, well, what's your position? Is the non-dilution, okay, 15% equity, non-diluted. Yes. Is non-diluted a material term of the agreement that your client alleges was reached? It is, Your Honor, and that is because 15% has to mean something, correct? So what does that mean? The 15% was before initial capitalization, such that, you know, funding would continue in the future, but before initial capitalization, or at the time of initial capitalization, that 15%, vis-a-vis the interest of others, including the defendants Aurora and Burns, was not to be diluted. Okay. So if the non-dilution is a material term, how do we make sure we're meeting the Illinois standard that the pleading has to be more than a conclusory statement, but actual words or acts or conduct, just for breach of contract? Because say we go with you, that the gentleman's name who's acting on behalf of Beheti, Navoradi. Yes. Let's go with your allegation that he had a, it was the party's shared understanding. Yes. That that 15% was going to be diluted. We're at the motion to dismiss stage, so say we go with you. How is the shared understanding more than a conclusory allegation of a meeting of the minds? Where do we have words or acts or conduct alleged? Well, I think that becomes the issue of the pleading standard, Your Honor, and we've cited cases in our brief that we think the court held, the district court that is, held my client to a more fact-based state court pleading standard than a federal court pleading standard. So, you know, did we have to say with such specificity that on such and such a date, you know, one of the defendants, Aurora Burns, whoever said with specificity this, I don't think that level of specificity is required for pleading purposes. Certainly not at this stage. Counsel. Yes. I don't hear you arguing that there was a definitive agreement for 15%, and we're here arguing what 15% means. You're saying that in your complaint, the offer was accepted upon the understanding that body, if I'm pronouncing that correctly, interest would not be diluted. Yes. But you never make any allegations about what the appellee's understanding was. Well, that's the intent of Paragraph 8 of the complaint. It's the party's understanding. It's not Mr. Nabulari's understanding. It's the party's understanding, and that's really the intent of Paragraph 8 of the complaint, which is the basis for that. Can you, kind of following up on the questions that my colleagues asked, what was the basis for Mr. Nabulari's understanding that the 15% was for non-dilutable interest? I'm sorry, the conversation that he had with Mr. Aurora, and that the 15% interest would not be diluted before or during the initial round of capitalization, which perhaps is outside the scope of the record, but during the time that my client was performing services, I don't think that happened. In other words, I don't think it was initially capitalized with that initial capitalization plan. So are you saying that there were further conversations with regard to whether or not the 15% interest is dilutable? No, I'm not saying that, but obviously the defendants issued certain papers beyond November 18, being the term sheet, being the capitalization table, being the MOU. And so that initial conversation is what created the agreement on November 18, 2018. That did not change in terms of the party's understanding. What changed is them saying, okay, now we're going to change the deal. That's what changed. So the MOU states that basically it's kind of non-bonding. These are kind of what we're thinking about. When your client received the MOU, did your client ever attempt to call the defendant and say, hey, look, it is binding, all this language in the MOU, because the MOU was received after this phone conversation, right? Yes. Was there ever an objection made saying, I don't understand why you say it's not binding, because we had this agreement? Well, I know there were conversations. What specifically was stated, I don't think that's in the record. But, again, there certainly were conversations that at some point there was documentation that was sent by the defendants to my client, misrepresenting the deal, saying sign this, and my client refused. He said that's not the deal. So ultimately did that happen? Yes. At what point before that did it happen? I don't think the record is clear. When your client received that MOU that Judge Lee was asking about on March 1, I believe it was. No, no, no. December 2018. And the MOU does misrepresent what your client understood to be the agreement. Why did your client begin working on March 1 by launching Yas Venture Holdings to begin to perform the development work? Well, what the MOU stated correctly is the plan and Party B, being my client, having a 15% equity interest. So, you know, that part of it was correct. My client was operating under the initial agreement of November 18, 2018, and rightfully began performing that work and providing the consideration that it agreed to provide. If it had not done that again, you know, we would be here with a different argument that we didn't perform, and therefore we were in breach of the contract. So I don't know if I've answered the Court's question, but, again, it all stems from the November 18, 2018 contract. I'm sorry, go ahead. Then when your client six days later gets the term sheet, which also seems to not reflect the Party's initial agreement, your client continues to work. Why? Because of the initial contract, November 18, 2018. In other words, my client said, in my mind, we have a deal, and I'm going to honor that deal, and I'm going to perform work. In fact, that continued for a long period of time before the defendant said, okay, stop work. And so, again, my client, believing it had a deal, continued to perform that work. So I take it that, going back to what Judge Kohler asked you, that your theory is that your client and the defendant did have an agreement at 15%, but there's just, at least on the breach of contract claim, there's just a disagreement as to what the 15% meant. At this point, it's part of the litigation. Whether, when, and under what circumstances that 15% was to be diluted, I think is a question of fact. I think the defendants have a viewpoint that differs from the viewpoint of my client. I think that's true. But during the course of that November 18, 2018 conversation, my client was clear. We're receiving a 15% interest in exchange for this value of software development work. And it's not that 15% is not going to be diluted before it's issued, before initial capitalization. That was the deal. And is there any allegation your client said that on that initial conversation that you said created the contract? I'm sorry, I didn't hear the question. You just laid out a bunch of facts about the non-dilutable interest. Is there any allegation in the complaint that your client said that as part of that initial oral contract? Well, again, I point to paragraph 8, Your Honor, and the understanding that's intended by paragraph 8 of the complaint is the party's understanding. Now, did that change? Was that initially the intent of the defendants, or was it not initially the intent of the defendants? There are pleading and allegations about that in the other accounts of the complaint. So, again, I think the primary fundamental issue here is at the motion to dismiss stage, was this appropriate action by the district court? And we certainly claim that it was not. So, Mr. Sumida, with regard to the fraud claims, right, other than just your kind of allegation that at the time of the conversation, defendants were intending to somehow dupe your client, are there any other facts upon which we can infer that the defendants actually, that that's what they were intending to do at the time? Well, and we have cited cases in our brief, Your Honor, that subsequent facts can indicate that a prior statement was false. And so if we look at the papering, unilateral papering of the quote-unquote deal by the defendants after the fact, we have the MOU, we have the term sheet, we have the cap table. Those things all become different from November 18, 2018 in that communication. And is your fraud claim based upon a theory that the defendants should have made it clear to you, their understanding that the interest was, in fact, dilutable? Yeah, that they never intended to issue that 15 percent interest before it was diluted. That's part of the allegation of the fraud claims. So, yes, and I'm not clear if I'm using my rebuttal time. You are. So at this point in time, unless there are other questions, I'll save my remaining time for rebuttal. Okay, thank you. Mr. Kidd. May it please the Court. We're here. The plaintiff is essentially on their fourth complaint here. This is the third amended complaint. The first amended complaint was also dismissed for failure to state a claim. The crux of the case, I think, is whether or not this alleged conversation between Raj Arora and Bala Navaluri, what happened in that conversation on November 18, 2018. And we essentially, the plaintiff's pleading in that regard is basically limited to two sentences. One sentence says that Raj Arora offered a 15 percent interest in MoCA for $600,000 worth of software development. The next sentence is all devoted to Mr. Navaluri, who is representing Mr. Behetti, and that is that Navaluri accepted the offer on the understanding that that 15 percent was non-dilutable. Mr. Navaluri's subjective understanding, what he thought, is really not controlling. That's certainly your argument, which I understand. But one way to read this sentence, and it's not an unreasonable way, is that it is referring to the party's shared understanding. And indeed, we're at the motion-to-dismiss stage, where we do need to draw reasonable facts and inferences in Mr. Behetti's favor as the plaintiff. So, okay, assuming we don't go with you, that this is Mr. Navaluri's subjective understanding, but this sentence is about the party's shared understanding, what more does Mr. Yash need to say in this complaint, at least for a standard breach of contract claim, without holding him to a heightened pleading standard? The fact of the matter is, it does not contain nearly enough of the material terms that you'd have to have for that contract. It doesn't tell us what form that 15 percent is going to take. Is this common stock? Is this preferred stock? Is it some sort of convertible interest? It doesn't tell us when it's going to issue. It doesn't tell us, and this is all pointed out really in Judge Darrell's order, that you could not essentially perform that contract based upon simply what was contained within that portion of the pleading. And there's no indication that they discussed any of that in the pleading. So we don't know what those other material terms would be. And, you know, you can't ignore what happens after that, and that is the memorandum of understanding that was issued. Well, before we move on to that, our law, Illinois law, says you can tell what's material if it becomes a bone of contention between the parties later. And here what's in contention is this idea of non-dilutable interest. So let's assume that's the material issue here. How is that not in paragraph 8? Because, again, you have to look and see what each of those sentences was addressing. The first sentence addresses what Mr. Arora addressed or offered to Balanav Alluri. The second sentence gives you what Balanav Alluri did, and it is restricted to him. It would be a very simple matter if the parties had agreed that it was going to be non-dilutable to plead that, and they don't plead any facts which support that. What they plead is that Balanav Alluri thought it was, at least according to that pleading. But you haven't accepted what I told you in my question. Let's assume we don't go with you on that. If we say this sentence here talks about the parties' shared understanding, what more does he need to plead? And then your answer to me is we need some more who, what, when, why, where. That certainly sounds like a heightened pleading requirement. I'm not saying it's a heightened pleading standard, but they do have to at least put in the material terms. And you can just look at this and say the material terms for a deal like this is going to include the form of the interest, when it's going to issue, what they're going to have to do to do so. And that's without even thinking about the memorandum of understanding. So, Mr. Kidd, what concerns me about that argument is that, in the end, the parties obviously believe they had some agreement, right, because the plaintiff performed and your client accepted the services. So there's some agreement there. I don't think you're saying that your client thought that the service was going to be performed for free. And so if that's the case, why isn't this a case like any typical breach of contract case where the parties agree to a contract, but there's a dispute as to what the terms were? That is a run-of-the-mill breach of contract case, as Judge Kohler was noting. Why isn't that what we have here as opposed to a case where there was no agreement to begin with? Because if that's the case, then why do you think what's the explanation for the plaintiff providing the services and your client accepting them? Well, I think my client, I mean, it's not in the record as to what the parties were thinking at the time. At the time of what? At the time that those services were provided. Okay. And I think my client expected to pay for them, get a bill and pay for them. And, in fact, you know, if you look at the subsequent, the – So despite all of these conversations beforehand about not paying for it and just giving the plaintiffs an interest in the business, now you're saying that, in fact, your clients actually were going to pay for it in cash. I think by the time they got to the services being performed, yes, sir. Because when the term sheet was issued on March 7th, and in the term sheet it provided for not software development work for their interest, but an investment of $600,000 in cash, which would have essentially provided the capital to pay for the work that was done. So what you're saying is that your clients don't owe the plaintiff an interest in the company, but you're conceding that your client, at a minimum, owes them money for the services they gave. I would suggest that they probably were owed money for the services, but in this, it would be more on the nature of an unjust enrichment claim. So we did all this work. We didn't get paid. But the plaintiff is not wanting to get paid. They could have, in the alternative, asked for compensation, equitable relief, with regard to the unjust enrichment claim. But they don't want that. I understand. I guess my point is that the parties' conduct after the conversation, what the parties did seems to at least plausibly, maybe not persuasively, but that's not the standard now, plausibly indicate that the parties had some sort of agreement leading up to the performance of that contract. I think they had—they were maybe starting work a little before the completion of the planning, but you have, like with a lot of startups, what you had was sort of a very fluid situation. You had this conversation, supposedly, that occurred. Then you have the memorandum of understanding, which is not consistent with what they say that conversation was. But it does say, and it indicates, that this is forming the basis for discussions concerning equity, roles, et cetera, and that some definitive agreement was contemplated. And then you have the term sheet, which, I mean, that was seven days after they supposedly began work. And it says $600,000 cash is the way you get your 15%, which was never contributed, obviously. And then there is the cap table, which comes out about a month later. And in that, it reflects that the interest for Behati's interest, Yash, was going to be 7.5%. This was a fluid situation that they had never resolved. They began work knowing that they did not have a deal, they did not have a contract, and it's not up to the court to make the contract for them. They may have simply been, it may be benign, but it may also be that they said, okay, we're going to get in here and we're going to do the work, and that's going to better our bargaining position with regard to where we are in this company. We don't know that. But what we do know is that the pleading itself doesn't say that either one of those parties made that offer to the other one in November and was accepted by the other party. I submit to you, you cannot read that pleading and really parse those two sentences and arrive at that conclusion. Therefore, I say that they have not, I submit that they have not adequately pled a breach of contract action that is plausible on its face. With regard to the promissory estoppel claim, again, they have to show that somebody made that promise to them. And they didn't really plead that Raj Arora or John Burns actually promised them a 15% non-dilutable interest, and that is what they're trying to get specific performance on. I know that you can look at other facts that are pled to conclude that that promise was made, but if you look at the other facts here, they don't support that that promise was made. And that really is one of the important reasons that you look at the memorandum of understanding, because it says this is all fluid. We're talking about forming a card processor. We're going to have future discussions about equity, et cetera, and roles. So the other facts don't support the implication that the promise was made. In fact, they support that that promise was not made, that it was going to be a 15% non-dilutable interest, because in neither the memorandum of understanding nor the term sheet is it reflected that they were non-dilutable. So I submit to you that the court properly dismissed the promissory estoppel claim. They also claim breach of fiduciary duty by Mr. Arora and Mr. Burns. And really, in order for there to be a breach of fiduciary duty, first they have to establish that there is a fiduciary duty. The only thing that they plead here as establishing the existence of a fiduciary duty is that they refer to Burns and Arora as promoters, that they were promoters of this stock. The fact of the matter is, when you look at the three of them there, if Burns and Arora were promoters, then Mr. Behetti was too, because he was an active participant in this at the very first stages. But they don't plead any underlying facts which show the basis for a fiduciary duty, the preexisting relationship that you normally have for the trust and confidence to arise where one trusts the other. They don't plead any of that. They base it solely on this claim of promoters. And I submit to you that it's clear that that does not establish a fiduciary duty, and the court properly dismissed those claims. In, I can't remember which amended complaint, they added an Exchange Act claim. The Exchange Act would require a purchase or sale of a security, which has not occurred. Admittedly, an enforceable contract for the purchase or sale of a security can supply that. That goes back to the contract argument, and that there was never a contract for the purchase or sale of a security. They also had to plead and establish scienter. And, you know, that's sort of, I'm not a securities lawyer as such, but my understanding, it requires essentially the knowledge and intent of the defendant to mislead and manipulate. And they really don't have any evidence of that, and they don't have any pleading of it. If anything, it appears that they're not hiding from the plaintiff anything with regard to their concept that they're going to change the ownership interests over time. Look at the Memorandum of Understanding or the term sheet, and they're both disclosing, hey, this is what we're planning on doing with regard to those ownership interests. So this intent is certainly not reflected. And the Exchange Act claim would be subject to 9B. Oh, I'm getting close to my time. I'm not already there. You are there. I'm sorry. I didn't notice. Thank you, Your Honor. Thank you. Mr. Zamuda, we'll give you two minutes. Thank you, Your Honor. With respect to the breach of contract issue, counsel was stating those terms are not clear. They were clear, and what paragraph 8 very clearly alleges is an offering of acceptance. And Exhibit D to the complaint is a June 10, 2019 email from Mr. Burns to Mr. Behetti and others in which he discusses a number of things. But one of those things is, and we don't agree with the date obviously, but he said we had originally presented essentially a plan for 40% for this new company to be formed, 15% for Mr. Burns, 15% for Mr. Aurora, and 15% for Key Executives, and 15% to Yash at a valuation of $4 million. That was the initial capitalization based upon which my client was offered the 15% interest and accepted that. Then he says, however, after talking with counsel, the fundamental problem with the all-common equity proposal. So it was clear to them that it was common stock. To say otherwise is simply contrary to the record. So we think that contract was clear. It was formed on November 18. Everything that followed was the ruse to dilute or somehow change that interest before it was issued. Counsel also discussed the issue of the fiduciary duty, and it is accurate to state that we alleged that Mr. Burns and Mr. Aurora are either promoters, directors, or officers of the company. We cited very specifically Delaware law. MoCA is a Delaware corporation. Judge Darrow, in her opinion, seemed to question why we were citing Delaware law, and that's because the entity is a Delaware corporation. But very clearly that case authority states that promoters, officers, and directors are fiduciaries. And we also alleged that the agreement reached in November was the subscription agreement, which both of those terms, promoter and subscription agreement, are terms of art that the court can understand. With respect, finally, to the Exchange Act claim, counsel was discussing Sienter. We cited in our brief the Carpenters Pension Trust Fund case, which says a contrary statement made after the initial false statement is made can be evidence of the initial false statement and should not be discounted as fraud by hindsight. And what we're saying is essentially if you put together the papering of the deal, as the defendants would like to call it after the fact, including an interest, and it's not clear how much, but of certain executives of a bank and Visa, which were disguised in the interests of Mr. Burns and Aurora, not separately stated on a cap table, you put all of those facts and the totality of the circumstances together, and that can create enough to provide Sienter. I'm sorry, Your Honor, I think that's a question. No, you're at time. I'm sorry. Thank you. Okay. Thank you. We will take this case under advisement.